UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK LEVIN and BECKY LEVIN,

                          Plaintiffs,

        -v-

GALLERY 63 ANTIQUES CORP.,
ROCHELLE SEPENUK, individually
and d/b/a GALLERY 63 ANTIQUES,

                          Defendants.

Case No. 04-CV-1504 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances</u>:

Anthony A. Scibelli, Esq.
C. Alex Hahn, Esq.
Scibelli, Whiteley and Stanganelli, L.L.P.
Boston, MA
*Counsel for Plaintiffs*

Steve Shin, Esq.
Wilmer, Cutler, Pickering, Hale & Dorr, L.L.P.
McLean, VA
*Counsel for Plaintiffs*

Jennifer Jenkins Middleton, Esq.
Richard Alan Levy, Esq.
Levy Ratner, P.C.
New York, NY
*Counsel for Defendants*

Scott D. Jacobson, Esq.
Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt & Harz, L.L.C.
Hackensack, NJ
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Mark Levin and Becky Levin (collectively the "Levins" or Plaintiffs) bring this action

against Gallery 63 Antiques Corp. ("Gallery 63") and Rochelle Sepenuk ("Sepenuk")

(collectively "Gallery 63" or Defendants) alleging nine causes of action:

(1) misrepresentation/fraud; (2) breach of Defendants' express warranties/contract under Article 2 of the New York Uniform Commercial Code ("N.Y. U.C.C."); (3) breach of the covenant of good faith and fair dealing; (4) money had and received; (5) unjust enrichment; (6) promissory estoppel; (7) negligence; (8) breach of Defendants' express warranties under section 13.01 of the New York Arts and Cultural Affairs Law ("New York Arts Law"); and (9) a violation of section 349 of the New York General Business Law.

Defendants move for summary judgment on all causes of action asserted in the Complaint. Defendants first argue that Plaintiffs' misrepresentation/fraud claim fails because Plaintiffs did not reasonably rely on any statements made by Defendants. Defendants contend that Plaintiffs cannot maintain a cause of action for breach of express warranties under N.Y. U.C.C. section 2 since they received exactly what was warranted. Defendants further assert that Plaintiffs' second cause of action, for breach of contract and/or breach of warranties, cannot stand because Plaintiffs' notice of revocation was untimely. With respect to Plaintiffs' third through sixth causes of action, for a breach of the covenant of good faith and fair dealing, money had and received, unjust enrichment, and promissory estoppel, Defendants assert that these "quasi contract" causes of action cannot be maintained since an express contract between the Parties exists that governs the dispute. Defendants next argue that Plaintiffs are unable to state a claim under the New York Arts Law because Plaintiffs' agent was an "art merchant." Finally, Defendants assert that Plaintiffs' claim under the New York General Business Law fails both because private party disputes do not affect the public interest and because the claim was brought after the applicable statute of limitations ran. Also before the Court, is Plaintiffs' cross-motion

2

for partial summary judgment on counts One, Two, Seven, and Eight of the Complaint with respect to one of the five sculptures, "Nude with Butterfly," sold to them by Defendants. For the reasons stated herein, Defendants' motion is granted in part and denied in part. Plaintiffs' motion is also granted in part and denied in part.

## I.  Background

The following facts are drawn from the Parties' Local Rule 56.1 statements, affidavits, depositions, and exhibits submitted in connection with these motions. They are undisputed except where noted.[1]

The Levins first hired Roger Harned ("Harned") in 1986 to help design the interior of their new home in San Francisco. (Defs.' 56.1 Statement ¶ 4; Pls.' 56.1 Resp. ¶ 4; Jacobson

---

[1] Under Local Rule 56.1 of this Court, a movant is required to submit a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1. The Rule also requires that "the papers opposing a motion for summary judgment shall include . . . a separate, short and concise statement of . . . material facts as to which it is contended that there exists a genuine issue to be tried," and that "[e]ach statement by the movant or opponent . . . controverting any statement of material fact, must be followed by citation to [admissible] evidence . . . ." *Id.* Unless controverted by the opposing party's statement, all material facts set forth in a movant's 56.1 statement that are supported by admissible evidence "will be deemed admitted." *Id.*

Here, both Parties' 56.1 movant statements comply with Local Rule 56.1. However, their 56.1 statements opposing the respective motions for summary judgment utterly fail to comply with the Rule. For example, the Parties' opposing statements both deny a number of the movant's numbered statements without citing to any evidence as the basis for the denial. Similarly, both Parties respond to a number of the movant's 56.1 statements by stating they are without knowledge or information sufficient to form a belief as to the truth of the particular statement. Such opposing statements are clearly inadequate under Rule 56.1. A genuine issue of dispute does not arise merely due to the opposing party's disbelief or lack of knowledge concerning the cited admissible evidence. *See Gallimore-Wright v. Long Island R.R.*, 354 F. Supp. 2d 478, 482-83 (S.D.N.Y. 2005) (noting requirement that 56.1 statements submitted by non-movants must cite to admissible evidence to support the contention there is a genuine issue for trial). Thus, where the movant's facts are disputed without any reference to the evidence to support such a contention, the Court accepts the movant's 56.1 statement as undisputed unless there is otherwise a basis in the admissible record that creates a genuine issue for trial.

Certification Exs. A, C at 3)  Harned represented to the Levins that he had expertise in interior design, including the acquisition and placement of antiques.  (Defs.' 56.1 Statement ¶¶ 3-4; Jacobson Certification Ex. C at 3)  During the course of that work, the Levins came to rely heavily on Harned for all aspects of the design of the interior of their home, including the purchase of antiques.  (Defs.' 56.1 Statement ¶¶ 3-4; Pls.' 56.1 Resp. ¶¶ 3-4; Jacobson Certification Ex. C at 3)  From 1986 through 1992, the Levins purchased many antiques recommended to them by Harned.  (Jacobson Certification Ex. C at 3)

In 1992, the Levins moved from San Francisco to Boston and again hired Harned to assist them in decorating their new home.  (*Id.* at 4)  In November 1996, the Levins signed a written letter agreement with Harned to recommend floor, wall, ceiling, and window treatments, and to present preliminary selections for all furnishings, including antiques for the Boston residence. (Jacobson Certification Ex. A)  Under the agreement, Harned was to be paid a one-time $10,000 design fee and a commission on all purchases made for the Levins.  With respect to antiques, Harned would earn a commission of approximately ten percent.  (Jacobson Certification Exs. A, C at 4)  The Levins understood Harned to be their agent and vested in him the express authority to purchase antiques and fine arts on their behalf.  (Defs.' 56.1 Statement ¶ 2; Pls.' 56.1 Resp. ¶ 2; Compl. ¶ 9)

In late 1999, Harned suggested that the Levins display sculptures in each of the five niches that were being built on one level of their Boston residence.  (Defs.' 56.1 Statement ¶ 5; Pls.' 56.1 Resp. ¶ 5; Jacobson Certification Ex. D)  On January 10, 2000, Harned informed the Levins that he would travel to New York to look for appropriate sculptures.  (Defs.' 56.1 Statement ¶ 6; Pls.' 56.1 Resp. ¶ 6; Jacobson Certification Ex. E)  In mid-January, Harned visited

4

Gallery 63, a sole proprietorship, owned and operated by Sepenuk.  (Defs.' 56.1 Statement ¶ 7; Pls.' 56.1 Resp. ¶ 7; Jacobson Certification Exs. F, G)

During the January 2000 visit to Gallery 63, Harned identified several pieces for the Levins' house.  (Defs.' 56.1 Statement ¶ 8; Jacobson Certification Ex. I)  Sepenuk prepared and gave Harned an undated memo listing seven sculptures that interested Harned.  (Defs.' 56.1 Statement ¶ 8; Jacobson Certification Ex. I)  The handwritten memo, addressed to "Roger," states, in pertinent part:

> A.  The Universe
> Antonio Frilli - Circa 1900
> Net 125,000 - my retail = $175,000
> Same artist recently sold at auction for $700,000 - another life size
> marble female - circa 1900
> value - open
>
> B.  [crossed out]
>
> C.  Cleopatra
> R. Romanelli - Full Life Size
> Provenance Fine Arts Museum of San Francisco
> Net = $150,000
> My Retail = 225,000
> value - open
>
> D.  G.B. Lombardi - Rome 1866
> Provenance American University of Rome
> [illegible]
> Net = 138
> 195 list
>
> E.  The Sculptress By Prof. R. Romanelli
> Life Size Woman with Chisel in her hand
> Net = 97,5000
> My Retail = $165,000
> 5% = 32,758.61
>
> F.  Nude Looking Down Prof. Petrelli

5

Net = $35,000 - My Retail = 45,000
(Had this a long time - Retail on the market = $75,000)

G.  Life Size Nude With Butterfly
A. Gearls 1845 (Dated on Marble)
Net = $145,000 (Without Ped) - My Retail = $210,000

(Jacobson Certification Ex. I)  The second statue, listed as "B" on the memo, was eliminated as

an option by Harned in the store.  (Jacobson Certification Ex. L)  After negotiating a five percent

discount if the Levins purchased five statutes together, Harned asked Sepenuk to hold the listed

statues until he could discuss the purchase with the Levins.  (Defs.' 56.1 Statement ¶ 9; Jacobson

Certification Ex. L)  Harned then took the memo, along with professional gallery photos of the

sculptures to show to the Levins.  (Jacobson Certification Ex. L)

The following day, Harned telephoned Sepenuk advising her that the Levins wished to

purchase five of the six listed statues, all of the statues except the statue listed as "F."  (Jacobson

Certification Ex. M)  During this conversation, Harned told Sepenuk that it would take some

time before the Levin house was ready for the statues and asked if Sepenuk could hold them, to

which she consented.  (Defs.' 56.1 Statement ¶ 11; Jacobson Certification Ex. M)  Concerned

that Gallery 63's insurance policy would not cover property already sold, Sepenuk obtained

appraisals so that the gallery could purchase additional insurance for the five Levin sculptures for

the term that they were to be held by the gallery.  (Defs.' 56.1 Statement ¶ 12; Jacobson

Certification Ex. N)  As a result, three appraisals, by Laurence Casper ("Casper"), Robert Kashey

("Kashey"), and Constinos Frangos ("Frangos"), were prepared for Gallery 63.  (Defs.' 56.1

Statement ¶¶ 13, 18, 26; Scibelli Aff. Exs. 7-9)

Sometime prior to January 20, 2000, Casper, a dealer, appraiser and fine arts consultant,

examined the five sculptures.  (Jacobson Certification Ex. O)  At the time, Casper was unaware that two other appraisals were simultaneously being conducted.  (Jacobson Certification Exs. O, P)  After performing a personal physical inspection of the statues and other research, Casper submitted an appraisal to Gallery 63 dated January 26, 2000, intended "for a determination of market replacement value as of [the] date of this appraisal."[2]  (Jacobson Certification Ex. S)  In general, the appraisal concluded that the condition of the marble of the five statues was "excellent with no damage and exhibiting the pristine white quality of the surface," that "[f]ull sized figures such as these are highly valued," and that "[t]he marbles are <u>original</u>, that is, they were created by the artist, and are not copies of other works or of their own creation."  (*Id.*)  The appraisal also gave a short description of each of the five works, including a notation of who signed the statue, and gave a replacement value range for each piece.  (*Id.*)  Casper's appraisal gave the following replacement values for the statues:  (1) *The Universe*, $330,000-350,000; (2) *Cleopatra*, $225,000-250,000; (3) *The Sculptress*, $200,000-210,000; (4) *Classical Figure*, $220,000-235,000; and (5) *Nude with Butterfly*, $220,000-250,000.[3]  (*Id.*)  The Casper appraisal noted that on the rear of the "Nude with Butterfly" statue, the piece was signed "A. Gearls, 1845."  (*Id.*)  Yet, Casper was unable to find anything in his research about Gearls.  As a result, Casper based his appraisal price range by evaluating the piece itself along with the subject matter, medium, size, condition, availability, and quality of the work.  (Jacobson Certification

---

[2] "Replacement value," was defined in the appraisal as the amount it would cost to replace an item with one of similar and like quality, purchased in the most appropriate market place within a limited amount of time.

[3] Some references to the five statues use slightly varying names for the pieces.  For the purposes of this motion, the Court adopts the names used in Casper's appraisal.

Ex. T)

Kashey, a fine arts and sculpture dealer, examined the five statues at Gallery 63, unaware that the gallery had hired other appraisers.  (Jacobson Certification Ex. W)  Kashey conducted his appraisal of the five statues and sent his written appraisal, dated January 27, 2000, to Sepenuk. (Scibelli Aff. Ex. 9)  Kashey thought that the sculptures looked to be in good condition. (Jacobson Certification Ex. V)  Kashey's appraisal included his fair market value estimate of the five pieces, which he defined as the price, based on his experience, that was competitive with the current market.  (Scibelli Aff. Ex. 9)  Kashey's appraisal determined the following value estimates for the five pieces:  (1) *The Universe*, $350,000; (2) *Cleopatra*, $265,000; (3) *The Sculptress*, $195,000; (4) *Classical Figure*, $250,000; and (5) *Nude with Butterfly*, $245,000. (*Id.*)

Kashey's appraisal also listed the names of the artists associated with each sculpture. (*Id.*)  A sculpture is identified with a particular artist, Kashey later explained, because "whether he carved it or he didn't carve it, it was carved with the direction of the artist in the time of the artist's lifetime and was a legitimate . . . object approved by the artist."  (Jacobson Certification Ex. AA)  Although Kashey's appraisal identified the sculptor of *Nude with Butterfly* as A. Gearls, Kashey did not know whether such an artist existed and actually assumed it was a misspelling of another name.  (Jacobson Certification Ex. CC)  In retrospect, Kashey thought he identified the sculptor of this piece as A. Gearls because he may have been supplied with that information from someone else.  (Jacobson Certification Ex. DD)  However, Kashey noted that he was not concerned with who the artist of the *Nude with Butterfly* was, but rather, he was "concerned that it was a[] 19th Century original carving."  (*Id.*)  Kashey's value estimate for

*Nude with Butterfly* was based on the "extraordinary beauty of the object and the authenticity to the fact that it could be anonymous, but it was done in the late 19th Century and not a recarving or not a 20th Century copy, but that it was an original model carving of extreme beauty of the 19th Century." (*Id.*)

Frangos, a specialist in Sotheby's Nineteenth Century Painting and Sculpture department, also inspected the five sculptures for Gallery 63. (Jacobson Certification Ex. EE)  In a report dated January 28, 2000, Sotheby's stated that based on Frangos's examination, the replacement values of the statues for insurance purposes was:  (1) *The Universe*, $300,000; (2) *Cleopatra*, $250,000; (3) *The Sculptress*, $180,000; (4) *Classical Figure*, $180,000; and (5) *Nude with Butterfly*, $200,000.  (Scibelli Aff. Ex. 8)  Frangos acknowledged that he was unfamiliar with "A. Gearls," the artist to which Sotheby's attributed *Nude with Butterfly*.  (Jacobson Certification Ex. FF)  Frangos also did not recall how he reached his estimate for *Nude with Butterfly*, but assumed that it was due to a combination of nudes being very desirable, and at least from the photo he reviewed at his deposition, the seemingly good quality of the statue.  (*Id.*)

A few days after Sepenuk started to receive the insurance appraisals, Harned contacted her to tell her the Levins were concerned about the cost of the sculptures.  (Jacobson Certification Ex. HH)  Harned explained the Levins were having "cold feet" about the purchase and asked if Sepenuk could get appraisals for the sculptures.  (*Id.*)  Sepenuk told Harned she already had insurance appraisals and Harned asked for them.  (*Id.*)  Sepenuk sent copies of the three appraisals to Harned with the understanding that he would show them to the Levins.  (*Id.*)  The Levins received the three Gallery 63 appraisals and decided that they wanted an "independent" appraisal, one that had not been done at the behest of the gallery.  (Jacobson Certification Ex. II;

9

Pls.' 56.1 Resp. ¶ 28)  Harned also gave the Levins a document on his letterhead with a total

"dealer price" for the five pieces as $970,000.  (Jacobson Certification Ex. JJ)  This document

was given to Margaret B. McClare ("McClare"), the Levins' personal assistant, in December

1999 and she understood it to be Harned's invoice for the sculptures.  (Jacobson Certification Ex.

KK)  The Levins also acknowledged that they received this document from Harned before they

purchased the sculptures.  (Defs.' 56.1 Statement ¶ 28; Pls.' 56.1 Resp. ¶ 28)

After deciding to obtain an independent appraisal, the Levins instructed McClare to find

and hire an appraiser.  (Jacobson Certification Ex. LL)  McClare did some research and then

spoke to and hired Beverlee Friedman ("Friedman"), an independent appraiser.  (Defs.' 56.1

Statement ¶ 29; Pls.' 56.1 Resp. ¶ 29; Jacobson Certification Ex. MM)  McClare provided

Friedman with a description of the five statues and a copy of the Casper appraisal.  (Jacobson

Certification Ex. PP ¶ 14)  Although there is evidence to suggest that the Levins wanted a written

appraisal from Friedman, Friedman told McClare she would not provide a written appraisal and

ultimately never provided one.  (Jacobson Certification Exs. PP ¶ 13, QQ)  Instead, after viewing

the sculptures, Friedman telephoned McClare to tell her that "they were magnificent," the pieces

"worked wonderfully together," and that she agreed with Casper's appraisal.[4]  (Jacobson

Certification Ex. OO)  Nevertheless, Friedman told McClare "that while the sculptures were in

pristine condition and beautiful, [she] thought they were overvalued in price."  (Jacobson

Certification Ex. PP)[5]  McClare imparted the contents of Friedman's verbal report to Mr. Levin,

---

[4] Friedman also told McClare that even if she had prepared a written report, it would have
mirrored Casper's report.  (Jacobson Certification Ex. OO)

[5] Plaintiffs' 56.1 response statement denies that Friedman told McClare the sculptures
were overpriced.  (See Pls.' 56.1 Resp. ¶ 30)  However, Plaintiffs do not cite to any admissible

after which he was prepared to move forward with the transaction.  (Jacobson Certification Ex. RR)

On February 22, 2000, Harned wired $622,725 to Gallery 63.[6]  (Defs.' 56.1 Statement ¶ 34; Pls.' 56.1 Resp. ¶ 34)  On the same date, Gallery 63 issued to Roger Harned Design an invoice describing the five statues and stating that the gallery would hold the pieces until notice of delivery was given.  (Jacobson Certification Ex. TT)  The description of the pieces on the invoice states:

> 1. One Original Marble Sculpture "The Universe["]
> Signed by Antonio Frilli, Circa 1900
> Five Feet High
>
> 2. One original Life Size Marble Sculpture of Cleopatra Holding
> the ASP to her breast
> Signed R. Romanelli, 19th Century
> 5'2" High.  Provenance "The Fine Arts Museum of San Francisco"
>
> 3. One Original Life Size Classical Figure of A Seated Woman
> Signed G.B. Lombardi
> 55 inches High
>
> 4. One Original Life Size Marble Sculpture "The Sculptress"
> depicting a kneeling woman with a chisel in her hand[.] Signed R.
> Romanelli, 19th Century.
>
> 5. One Original Life Size Marble Sculpture of A Seated Woman
> With a Butterfly on her Shoulder[.]  Signed A. Gearls 1845

(*Id.*)  In August 2000, the sculptures were shipped by Gallery 63 to the Levins' Boston home and were installed in the Levin home from August 14 through August 18.  (Defs.' 56.1 Statement ¶

_____

evidence to cast doubt on Friedman's Declaration.

[6] In total, the Levins paid $970,000 for the five statues, of which $622,725 was paid directly to Gallery 63.

36; Pls.' 56.1 Resp. ¶ 36; Jacobson Certification Ex. UU)  In 2000, the Levins bought another

home in Rhode Island and on April 27, 2000, they signed a contract with Harned similar to the

Boston contract, obtaining his services to help design the interior of the house.  (Jacobson

Certification Ex. C at 5-6)  Subsequently, on October 31, 2000, the Levins wired Harned $4.9

million to purchase antiques he had recommended and they had approved for the Rhode Island

home.  (Defs.' 56.1 Statement ¶ 37; Pls.' 56.1 Resp. ¶ 37; Jacobson Certification Ex. B ¶ 18)

On December 6, 2000, Ms. Levin sent Harned an email titled "art - a real concern has

surfaced."  (Defs.' 56.1 Statement ¶ 38; Pls.' 56.1 Resp. ¶ 38; Jacobson Certification Ex. WW)

The email referenced an appraisal for a piece of art, separate from the five statues, that suggested

the Levins were severely overcharged by Harned.  Ms. Levin inquired:

> Has [sic] all of our purchases been over-priced to this degree? . . .
> I would like some explanation here before I share this information
> with Mark.  Suffice to say he will be furious and want all of your
> purchases reevaluated.  Wouldn't you?  Roger, I feel very taken
> advantage of and not feeling very good about this recent $5 million
> shopping spree. . . . We may want to return quite a few things.  I
> must say, I was a little suspicious when we were offered no
> discount on these bulky purchases, but now it is [sic]
> overwhelming concern.

(Jacobson Certification Ex. WW)  Mr. Levin also first became concerned about the antiques

purchased by Harned over the course of a few months in late 2000, early 2001.  (Jacobson

Certification Ex. XX)  Mr. Levin recalled the concern started as a result of a restorer walking

through their Boston home who told the Levins that at least some of their antiques were fake.

(*Id.*)  Separately, during this time period, an art advisor told the Levins that Harned's art advice

was incorrect.  (*Id.*)  A restorer also questioned the quality of the five statues, stating that they

were not worth fixing because they were fake.  (*Id.*)  Finally, in January 2001, the Levins brought

in three appraisers who all questioned the quality of many of the pieces of art in the Levins'
Rhode Island and Boston homes.  (Defs.' 56.1 Statement ¶ 40; Pls.' 56.1 Resp. ¶ 40; Jacobson
Certification Ex. ZZ)  These three appraisers evaluated a number of items purchased by Harned
on behalf of the Levins.  (Jacobson Certification Exs. WW, ZZ)  Yet, nothing in the record
details what pieces were evaluated or whether the five Gallery 63 statues were appraised at that
time.  In 2003, Marshall Falwell ("Falwell"), one of the appraisers the Levins retained in 2001,
told McClare that one of the Gallery 63 statues had previously sold at auction for $30,000.
(Defs.' 56.1 Statement ¶ 42; Pls.' 56.1 Resp. ¶ 42; Jacobson Certification Ex. 3)  McClare was
surprised by the low price and relayed the information to Ms. Levin.  (Jacobson Certification Ex.
3)  The Levins then brought in Falwell to inspect the five statues.  (Defs.' 56.1 Statement ¶ 42;
Pls.' 56.1 Resp. ¶ 42; Jacobson Certification Ex. 3)  Falwell's evaluation, done with a black light,
allegedly revealed that the statues were damaged.  (Jacobson Certification Ex. 3)

    The Complaint in this case was filed on February 18, 2004.  In early 2004, the Levins
obtained the services of Peter Sorlien ("Sorlien") to appraise the five Gallery 63 statues.  Over
the course of three days in March and April 2004, Sorlien examined the five sculptures and in an
appraisal report dated April 14, 2004, Sorlien stated that in his opinion the total fair market value
of the five sculptures was $125,000.  (Jacobson Certification Ex. 2)  Sorlien's report does not
dispute that the five statues were Nineteenth Century Italian sculptures.  (*Id.*)  Further, Sorlein
did not doubt the signatures attributed by Gallery 63 for *The Universe*, *Cleopatra*, *The
Sculptress*, or *Classical Figure*.[7]  (*Id.*)  Yet, because of the workshop system characteristic of
nineteenth century Italian academic marbles, Sorlein maintained that the term "original" can only

---

[7] *Nude with Butterfly* is discussed below.

be applied to such statues with qualification.  (*Id.* at 16)  Defendant's expert, Victor Weiner ("Weiner"), contested Sorlein's conclusion about originality.  Weiner argued that, as it relates to Nineteenth Century academic sculpture, "'original' means that the work was produced at the time and by the artist's studio in which the master artist could supervise and ascertain that the finished work met his design and creative vision."  (Jacobson Certification Ex. 5 at 6)  Thus, he concluded, Gallery 63's invoice did not misrepresent that the statues the Levins acquired were originals.  (*Id.* at 1)  Weiner also challenged Sorlein's opinion that the sculptures were "damaged" as the term is used by the trade, because "dealers in 19th century sculpture usually do not list any damage and restoration unless it is truly significant."  (*Id.* at 7)  Furthermore, Weiner stated Sorlien's assessment of damage is incorrect because he is unqualified to assess conditions of sculptures, his assessment occurred more than four years after the purchase from Gallery 63, and because the four appraisals conducted in January and February 2000 concluded there was no significant damage to the statues.  (*Id.* at 7-8)  Finally, Weiner challenged Sorlien's assessment of the fair market value of the statues.  (*see generally* Jacobson Certification Ex. 5)

Sorlien's report also questioned the attribution in Gallery's 63's invoice of *Nude with Butterfly* to A. Gearls.  (Jacobson Certification Ex. 2 at 25)  Wiener agreed with Sorlien's conclusion that due to the signature on the statue and other factors, the statue was properly attributed to Karel Hendrik Geerts ("Geerts") and not Gearls, a name unknown in scholarly literature.  (Jacobson Certification Ex. 5 at 16)  However, Wiener argued that due to the statue's shallow signature it was understandably misread and suggested that the signature may have been more legible after the Levins had the statue cleaned.  (*Id.*)  Wiener concluded that the correct attribution to Geerts only increased the value of the statue because rather than purchasing a

14

sculpture by an unknown or anonymous artist, the Levins acquired a sculpture by a known and collected artist.  (*Id.* at 17)

## II.  Discussion

### A.  Summary Judgment Standard

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  In ruling on a motion for summary judgment, the Court is "not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citing *Liberty Lobby*, 477 U.S. at 255).  "As such, the non-movants . . . 'will have [their] allegations taken as true, and will receive the benefit of the doubt when [their] assertions conflict with those of the movant.'"  *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (quoting *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996)).

"'The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, . . . or defeat the motion through mere speculation or conjecture.'"  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 574 (2d Cir. 2005) (quoting *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).  "While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. 'Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Aetna Cas. & Sur. Co.*, 404 F.3d at 574 (quoting *Liberty Lobby*, 477 U.S. at 248). Thus, if there is a genuine dispute over a material fact "such that a reasonable jury could return a verdict for the nonmoving party," summary judgment must not be granted. *Liberty Lobby*, 477 U.S. at 248. When considering cross-motions for summary judgment, courts apply the same standards and "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.").

#### B.  Fraud and Misrepresentation Claims

Plaintiffs' first cause of action is for fraud.  To state a claim for fraud under New York law, the Levins must demonstrate:  (i) a representation of material fact; (ii) falsity; (iii) scienter; (iv) reasonable reliance; and (v) injury.  *See Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (citing *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001)).  To plead fraudulent misrepresentation the Levins must likewise allege that they reasonably relied on false representations made by Defendants.  *See id.* at 363-64 (collecting cases).

Defendants Gallery 63 and Sepenuk argue that Plaintiffs, the Levins, did not reasonably rely on any misrepresentation by Defendants in deciding to purchase the five statues.  Defendants also contend that the Levins were not prevented from fully inspecting the statues or engaging in

due diligence.  (Defs.' Br. in Supp. of Mot. for Summ. J. 16 ("Defs.' Br."))  Moreover,

Defendants argue, any reliance upon their alleged representations concerning the statues is

relieved by the Levins' trust in Harned's expertise, Friedman's assessment of the statues and

their value, and the Levins' subsequent failure to act on Friedman's concerns regarding the value

of the statues.

      "'In assessing the reasonableness of a plaintiff's alleged reliance, [a court should]

consider the entire context of the transaction, including factors such as its complexity and

magnitude, the sophistication of the parties, and the content of any agreements between them.'"

*Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006) (quoting *Emergent Capital Inv.*

*Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)).  Not surprisingly, then,

"[t]he question of what constitutes reasonable reliance is always nettlesome because it is so fact-

intensive."  *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).

However, "if the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the

truth, or the real quality of the subject of the representation, he must make use of those means, or

he will not be heard to complain that he was induced to enter into the transaction by

misrepresentations."  *Id.* (citations and quotations omitted); *see also Crigger*, 443 F.3d at 234

("A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable

reliance without making inquiry and investigation if he has the ability, through ordinary

intelligence, to ferret out the reliability or truth about an investment . . . ."); *Most v. Monti*, 456

N.Y.S.2d 427, 428 (App. Div. 1982) (affirming dismissal of fraud claim where the information

relating to the fraud was "readily available to plaintiffs upon their making reasonable inquiry" yet

they unreasonably failed to investigate).  Furthermore, "[a] heightened degree of diligence is

required where the victim of fraud had hints of its falsity." *Banque Franco-Hellenique Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997).

Here, the transaction was neither inherently complex nor of such a magnitude that it was outside the range of similar transactions undertaken by Plaintiffs involving other artwork. Although Plaintiffs' were not experienced art collectors, their lack of sophistication in connection with art was ameliorated by Harned's knowledge, who acted, at all stages of the transaction, as their agent with express authority to purchase art on their behalf.  (Pls' 56.1 Statement ¶ 4)  Harned was hired by Plaintiffs, in part, due to his experience in finding and obtaining valuable furnishings.  Moreover, the facts allegedly represented by Defendants to Plaintiffs, were not matters peculiarly within Defendants' knowledge.  Plaintiffs and their representatives were never denied the right to enter Defendants' premises, Gallery 63, and perform any test or appraisal they desired to evaluate and otherwise ascertain the value of the statues before the transaction was finalized.  Plaintiffs took advantage of this opportunity by obtaining Friedman's independent evaluation of the statues after Sepenuk forwarded the allegedly fraudulent appraisals, but before purchasing the statues.  After viewing the statues, Friedman's evaluation corroborated the high quality of the statues but noted that, in her opinion, they were overvalued in price.  Thus, Friedman's evaluation provided more than a hint that the statues were overpriced.  Yet, Plaintiffs elected not to heed the warning signs.

In light of the undisputed evidence demonstrating that Plaintiffs enjoyed unfettered access to the statues and had their own independent experts assess their value, Plaintiffs' claim of justifiable reliance on Defendants' alleged representations is unfounded as a matter of law.  As noted by the Second Circuit:

> When the means of knowledge are open and at hand, or furnished
> to the purchaser or his agent, and no effort is made to prevent the
> party from using them, and especially where the purchaser
> undertakes examination for himself, he will not be heard to say that
> he has been deceived to his injury by the misrepresentations of the
> vendor.

*Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 737 (2d Cir. 1984) (citing *Shappirio v. Goldberg*, 192 U.S. 232, 241-42 (1904)).  Indeed, there is no contention by Plaintiffs, nor is there reason to believe, that the information required to confirm or disprove the validity of Defendants' representation was only available to Defendants.  *Id.* at 738 (distinguishing cases where "the allegedly undisclosed information was only known by – and indeed only available to – the defendants, and incapable of discovery by the plaintiff, no matter how diligent its investigation"); *see also Hyosung Am., Inc. v. Sumagh Textile Co.*, 137 F.3d 75, 79 (2d Cir. 1998) (noting disinclination to entertain claims of justifiable reliance where the critical information relating to the misrepresentation is discoverable by the means of ordinary intelligence through the performance of due diligence); *T.T. Exclusive Cars, Inc. v. Christie's Inc.*, No. 96 Civ. 1650, 1996 WL 737204, at *4 (S.D.N.Y. Dec. 24, 1996) (dismissing negligent misrepresentation claim where plaintiff had every opportunity to view and inspect an auctioned classic car and there was no allegation that defendants possessed any unavailable information regarding the condition of the car); *Cudemo v. Al & Lou Constr. Co.*, 387 N.Y.S.2d 929, 930 (App. Div. 1976) (plaintiff could not have reasonably relied upon representation that her car could fit in the garage of the newly purchased home because this fact could be easily ascertained by plaintiff); *Didomenico v. Long Beach Plaza Corp.*, Index No. 3020/03, 2003 WL 22762712, at *2 (N.Y. Sup. Ct. Oct. 28, 2003) (reliance unreasonable when alleged contamination of property was not within franchisor's

peculiar knowledge and franchisee "could have ascertained or discovered the true state of affairs by exercise of due diligence and reasonable investigation").  Thus, it cannot be said on this record that Plaintiffs relied solely upon Defendants' representations as to the quality, provenance, or price of the statues.  And, under the circumstances, even if Plaintiffs did rely on Defendants' representations, "such reliance was plainly unjustifiable given [their] extensive inquiries and investigations."  *Grumman Allied Indus., Inc.*, 748 F.2d at 738; *see also Petrello v. White*, 412 F. Supp. 2d 215, 229 (E.D.N.Y. 2006) (holding reliance on alleged misrepresentations unreasonable where the party making such a claim, at least to some degree, relied upon its own independent investigation).  Accordingly, Plaintiffs' claim of reliance on Defendants' alleged misrepresentations, and therefore, Plaintiffs' fraud and misrepresentations claims fail as a matter of law.

Also, because justifiable reliance is an essential element of promissory estoppel claims under New York law, Plaintiffs' sixth cause of action for promissory estoppel also fails as a matter of law.  *See Cyberchron Corp. v. Calladata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (stating that "reasonable and foreseeable reliance" is an element to New York promissory estoppel claim); *Four Finger Art Factory, Inc. v. Dinicola*, No. 99 Civ. 1259, 2000 WL 145466, at * 8 (S.D.N.Y. Feb. 9, 2000) (requiring reasonable reliance for promissory estoppel claim).

C.  Express Warranty Claims

Counts Two and Eight of the Complaint allege that the invoice issued by Defendants and the appraisals passed on by Defendants made specific representations and warranties about the

statues and that Defendants breached such warranties.[8]  Plaintiffs contend that the invoice and appraisals warranted that the statues were originals signed by specific artists in excellent condition and of a certain value, when in fact, the statues were copies of statues made by workshops and signed by others on the artists' behalf and damaged.  Defendants first challenge the contention that the invoice or appraisals amounted to an express warranty.  Even if the invoice and appraisals were express warranties, Defendants maintain that they were not breached because under both the New York Arts Law and prevailing terminology used in the trade, Plaintiffs received "original" sculptures.  Defendants next challenge the allegation that the statues were damaged, arguing that Plaintiffs' expert is unqualified to assess damage and his assessment is inaccurate in that it took place more than four years after the statues were delivered to the Levins and after they were cleaned by people hired by the Levins.  Defendants also maintain that no warranty was breached under the New York Arts Law because the Levins are not entitled to the protections of the New York Arts Law as a result of employing Harned as their agent in the purchase of the statues.

While at times seeming to concede that the invoice and appraisals amounted to an express warranty, Defendants also suggest that aspects of these documents, such as the identities of the

_____

[8] Plaintiffs also fashion their breach of contract claim as a breach of the covenant of good faith and fair dealing.  A breach of the implied covenant of the duty of good faith and fair dealing "is merely a breach of the underlying contract," *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citations and quotations omitted), and "can only impose an obligation consistent with other mutually agreed upon terms in the contract."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (citations and quotations omitted); *accord Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (noting that a separate cause of action for breach of implied covenant of good faith and fair dealing is not recognized "when a breach of contract claim, based upon the same facts, is also pled").  Thus, the Court treats the breach of the covenant of good faith and fair dealing as subsumed within the breach of contract claim.

artists, were not part of the "basis of the bargain" and therefore were not express warranties.
(Mem. in Opp. to Pls.' Mot. for Partial Summ. J. 5 ("Pls.' Opp. Mem."))  Under New York Arts
Law, an express warranty is created "whenever an art merchant, in selling or exchanging a work
of fine art, furnishes to a buyer of such work who is not an art merchant a certificate of
authenticity or any similar written instrument."  N.Y. Arts & Cult. Aff. Law § 13.01(1).  Section
2-313 of the N.Y. U.C.C. provides, in more general terms, that "[a]ny description of the goods
which is made part of the basis of the bargain creates an express warranty that the goods shall
conform to the description."  N.Y. U.C.C. § 2-313(1)(b).  Defendants reliance on the "benefit of
the bargain" equations implies that section 2-313 of N.Y. U.C.C. governs this dispute.  However,
as recently noted by the First Circuit in applying New York law, the New York Arts Law
concerning express warranties "supplants the otherwise applicable provisions of the Uniform
Commercial Code."  *Levin v. Dalva Bros.*, 459 F.3d 68, 77 (1st Cir. 2006) (citing *Dawson v. G.
Malina, Inc.*, 463 F. Supp. 461, 465 n.3 (S.D.N.Y. 1978)).  Thus, the relevant provision of the
New York Arts Law "provides that where an art merchant states to a lay person that a piece is by
a specific author or can be attributed to a specific period, the statement 'shall create an express
warranty.'"  *Id.* (quoting N.Y. Arts & Cult. Aff. Law § 13.01(1))

A certificate of authenticity is defined as "a written statement by an art merchant
confirming, approving, or attesting to the authorship of a work of fine art or multiple, which is
capable of being used to the advantage or disadvantage of some person."  N.Y. Arts & Cult. Aff.
Law § 11.01(6).  Here, there is no question of fact that, among other things, the invoices and
three appraisals given to Plaintiffs by Defendants attested to the authorship of the statues.  Thus,
the invoices and appraisals were certificates of authenticity.  The Court addresses separately,

22

where appropriate, when there is a question of fact as to what representations stated in these documents were material such that an express warranty was created.

"Under New York law, if the warranty at issue is material to the agreement, a party need not prove that it had actually relied on that warranty when entering into the transaction," to establish a breach of warranty claim. *Lasalle Bank Nat'l Ass'n v. Carpo Am. Securitization Corp.*, No. 02 Civ. 9916, 2005 WL 3046292, at *5 (S.D.N.Y. Nov. 14, 2005); *see also Donald v. Shinn Fu Co. of Am.*, No. 99 Civ. 6397, 2002 WL 32068351, at *5 (E.D.N.Y. Sept. 4, 2002) ("Reliance is a part of an express warranty claim, but only in the sense that a party to a contract must rely on the inclusion of an express warranty in order to make an agreement.  So long as a plaintiff can show that the express warranty was part of the bargained-for agreement, plaintiff can succeed on an express warranty claim regardless of actual reliance on the particular terms of the warranty."); *Metromedia Co. v. Fugazy*, 753 F. Supp. 93, 99 (S.D.N.Y. 1990) (noting that the only reliance necessary is the "buyer's belief that it was purchasing the seller's promise as to the truth of the matters stated in the warranty. . . . Even if the warranties were not the subject of explicit discussions, . . . their inclusion in the written contract establishes that they were part of the bargain reached between the plaintiff and the defendants." (citations omitted)); *CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 997, 1001 (N.Y. 1990) ("The critical question is not whether the buyer believed in the truth of the warranted information, as [the seller] would have it, but whether it believed it was purchasing the seller's promise as to its truth." (quotations and alterations omitted)).  Furthermore, any information about the provenance or quality of the statues the Plaintiffs may have gained through their own efforts prior to the purchase does not waive their breach of warranty claim.  *See Paraco Gas Corp. v. AGA Gas, Inc.*, 253 F. Supp. 2d

23

563, 577 (S.D.N.Y. 2003) (holding buyer's independent discovery of information that constituted breach of seller's warranties prior to the sale did not constitute waiver); *see also Rogath v. Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997) (finding buyer retains breach of warranty claim when the seller is not the source of the information that facts warranted are false).  Thus, Plaintiffs' potential knowledge of such facts from other sources, including Friedman and Harned, does nothing to defeat Plaintiffs' warranty claim.

Defendants argue that Plaintiffs are not entitled to avail themselves of the special protections of the New York Arts Law concerning express warranties because Harned, an alleged "art merchant," acted as Plaintiffs' agent.  Section 13.01 of the New York Arts Law provides the framework for assessing express warranties in the context of art sales:

> 1.  Whenever an art merchant, in selling or exchanging a work of fine art, furnishes to a *buyer of such work who is not a art merchant* a certificate of authenticity or any similar instrument it:
>
> (a) Shall be presumed to be part of the basis of the bargain; and
>
> (b) Shall create an express warranty for the material facts stated as of the date of such sale or exchange.
>
> 2.  . . . such warranty shall not be negated or limited provided that in construing the degree of warranty, due regard shall be given the terminology used and the meaning accorded such terminology by the customs and usage of the trade at the time and in the locality where the sale or exchange took place.
>
> 3.  Language used in a certificate of authenticity or similar written instrument, stating that:
>
> (a) The work is by a named author or has a named authorship, without any limiting words, means unequivocally, that the work is by such named author or has such named authorship;
>
> (b) The work is "attributed to a named author" means a work of the

24

> period of the author, attributed to him, but not with certainty by
> him; or
>
> (c) The work is of the "school of a named author" means a work of
> the period of the author, by a pupil or close follower of the author,
> but not by the author. . . .

N.Y. Arts & Cult. Aff. Law § 13.01 (emphasis added).  "Art merchant" is defined as "a person who by his occupation holds himself out as having knowledge or skill peculiar to such works, or to whom such knowledge or skill may be attributed by his employment of an agent or other intermediary who by his occupation holds himself out as having such knowledge or skill."  N.Y. Arts & Cult. Aff. Law § 11.01(2).

Defendants argue that since Harned was Plaintiffs' agent and held himself out as having knowledge about the statues, he was an art merchant and therefore Plaintiffs cannot look to the protections of section 13.01.  But Defendants understanding of an art merchant under section 11.01 is too broad.  By all accounts, Harned told Sepenuk he was an interior designer purchasing the statues for clients.  (*See* Jacobson Certification Ex. K)  While an interior designer may have some expertise in selecting furnishings for a home,[9] there is nothing in the record to suggest that Harned had or held himself out to have "knowledge or skill *peculiar*" to the type of statues sold here.

Defendants next argue that section 13.01 does not apply because the statues were "multiples," and thus not "fine art" covered by section 13.01.  By its terms, section 13.01 only applies to sales of "fine art."  N.Y. Arts & Cult. Aff. Law § 13.01(1).  "Fine art" is defined as "a

---

[9] "Interior design"is defined as "the art or practice of selecting and organizing the surface coverings, draperies, furniture, and furnishings of an architectural interior."  *Webster's Third New International Dictionary* (2002)

25

painting, sculpture, drawing, or work of graphic art, and print, but not multiples."[10]  N.Y. Arts &

Cult. Aff. Law § 11.01(9).  To conclude that the statues sold to the Levins were multiples would

require the Court to side-step one of the main factual disputes in this case.  Plaintiffs allege that

each statue was represented to be an original, in other words a sculpture that is not a multiple.  It

defies logic to suggest that someone who allegedly mis-warrants a work to be an original could

escape section 13.01's heightened protection by later claiming that the work is, in fact, a

multiple.  Accordingly, Plaintiffs' warranty claim is properly subject to section 13.01.[11]

Defendants deny that the representations made in the invoice and appraisals sent to

Plaintiffs were inaccurate in any material degree, and maintain that they are not liable for breach

of warranty.  As warranted, the sculptures were all "originals," "signed" by various artists, in

"excellent" condition, and appropriately valued.  Plaintiffs assert that these descriptions were

---

[10] "'[M]ultiples' means . . . sculpture and similar art objects produced in more than one copy and sold . . . ."  N.Y. Arts & Cult. Aff. Law § 11.01(20).

[11] Although Defendants rely on article 13 of the New York Arts Law in their original Brief, they argue for the first time in their Reply Brief, that article 15 of the New York Arts Law solely governs the warranty claims.  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. 3-4 ("Defs.' Reply Br."))  Defendants contend that since they were only subject article 15's more limited disclosure obligations for pre-nineteen hundred works, Plaintiffs "cannot assert claims grounded on the breach of an express warranty."  (Defs.' Reply Br. 4)  Article 15 sets forth the information required for sales of sculptures produced in multiples.  Specifically, section 15.09 details the information required to be supplied to a buyer "as to each *multiple* [sculpture] produced prior to nineteen hundred."  N.Y. Arts & Cult. Aff. Law § 15.09 (emphasis added).  Section 15.09 requires disclosure of certain information outlined in section 15.03.  *Id.*  Specifically, the relevant parts of section 15.03 require sellers to supply the following information "as to each *multiple*": (1) name of artist; (2) medium or process; and (3) time produced.  N.Y. Arts & Cult. Aff. Law § 15.03 (emphasis added).  Section 15.09, by its terms, only applies to multiples.  As noted above, there is a dispute of fact over whether the Gallery 63 statues were in fact multiples or fine art, and, more importantly, what they were represented by Defendants to be.  Thus, instead of looking to section 15.09, Plaintiffs are afforded section 13.01's protections including the creation of an "express warranty for the material facts stated as of the date of such sale."  N.Y. Arts & Cult. Aff. Law § 13.01.

material and inaccurate, and thus a breach of Defendants' warranties.

### 1.  "Original" and "Signed"

The Parties disagree over what the term "original" means in the context of Nineteenth Century Italian Academic sculpture and what it means for such statutes to be "signed" by an artist.  Thus, the first issue presented is whether the five statues were in fact "originals" and "signed" as represented by Defendants.

Defendants first argue that the New York Arts Law only contemplates sculptures as "multiples."  Therefore, they maintain, the representation that the statues were "original" could only mean they were authentic multiples of the named artist.  In support, Defendants point to section 11.01(18) of the New York Arts Law, that defines "sculpture" as "'a three-dimensional fine art object . . . carved in multiple from a mold model, case, form, or other prototype.'" (Defs.' Br. 8 (quoting N.Y. Arts & Cult. Aff. Law § 11.01(18)))  However, the definition in section 11.01 is not dispositive on this point because the same section also defines "Fine art" to include a "sculpture . . ., but not multiples," and defines "multiples" to include "sculpture . . . produced in more than one copy . . . ." N.Y. Arts & Cult. Aff. Law § 11.01(9), (20).  From these inconsistent definitions, section 11.01 contemplates sculpture that is distinct from a multiple or a copy.  Thus, Defendants' reliance on section 11.01 to elucidate what an "original" statue means is misplaced.

Relying on their experts, Defendants next argue that in the context of how Nineteenth Century Italian Academic sculptures were created, the statues here were originals created by the artists identified on the invoice.  Defendants' expert explained that Nineteenth Century Italian Academic sculptures, such as the five statues here, were created in multiple versions by a given

artist's studio.  "Thus, as it relates to 19th century academic sculpture, 'original' means that the work was produced at the time and by the artist's studio in which the master artist could supervise and ascertain that the finished work met his design and creative vision."  (Jacobson Certification Ex. 5 at 6)  Plaintiffs' expert does not dispute that the pieces are genuine Nineteenth Century Italian Academic sculptures and that under the Italian workshop system an artist under the direction of the named or signed artist would often carve a sculpture which was then signed by the founder of that workshop.  However, that leads Plaintiffs' expert to arrive at the more circumspect conclusion that "it is virtually impossible to designate any one marble sculpture as the original, and not a copy," and thus, "[i]n truth, the terms 'original' and 'authentic' can be applied to such sculptures only with qualification."  (Jacobson Certification Ex. 2 at 16)

The Parties also disagree over what it means in the context of an appraisal or invoice to warrant that a statue is signed by or attributed to a specific artist.  Defendants' invoice noted by whom each statue was signed.  The appraisals forwarded by Defendants to Plaintiffs are slightly different than the invoice, in that rather than noting a statue was "signed by" a particular artist, the appraisals list each statue by artist.  Except for the "A. Gearls" signature on *Nude with Butterfly*, Plaintiffs do not dispute that Defendants' representation of the signatures accurately reflects the signatures on the statues.  Instead, Plaintiffs argue that the signature attribution on the appraisals incorrectly warrant that the statues were created by the artists themselves when they may very well have been created by the artists' respective workshops.  Defendants do not contest that the statues may have been created by the named artists' workshops, but maintain that "in the case of multiples," which they concede the statues are, an artist is defined as "'the person who conceived or created the image which is contained in or which constitutes the master'" from

28

which the individual print was made.  (Defs.' Br. 8-9 (quoting N.Y. Arts & Cult. Aff. Law §
11.01(1)))  Thus, they argue, under the prevailing trade customs and usage, a statue created by an
artist and his workshop is considered an original created by the named artist.  (Defs.' Br. 9)

Plaintiffs' expert's opinion encouraging qualification in attributing a piece to an artist has
strong support in the section of the New York Arts Law governing express warranties, which is
unmistakably sensitive to attribution claims.  Section 13.01(3) draws clear distinctions between
different ways of attributing authorship to a piece of art.  A certificate of authenticity stating that
a "work is by a named author or has a named authorship, without any limiting words, means
unequivocally, that the work is by such named author . . . ."  N.Y. Arts & Cult. Aff. Law §
13.01(3)(a).  Thus, unqualified authorship is different from a work "attributed to a named
author," which means "a work of the period of the author, attributed to him, but not with
certainty by him," or a work ascribed to the "school of a named author," which means "a work of
the period of the author, by a pupil or close follower of the author, but not by the author."  N.Y.
Arts & Cult. Aff. Law § 13.01(3)(b)-(c).

Here, the attributions in the invoice and appraisals were not qualified to explain that the
statues were or may have been created under the supervision of the named artist or that they were
potentially copies made in the prevailing studio tradition.  Defendants' own expert stated that it
was "frequently impossible to determine whether a carving was the first or 'original' of the
several replications made of the same work," and that "[s]ince almost every piece was produced
in a studio that created multiple versions of a given piece, the aesthetics or look of the sculpture,
not authorship, is the dominant factor in pricing 19th century academic sculpture."  (Jacobson
Certification Ex. 5 at 6)  In one example, Defendants' expert went to great length to note that the

inscription on *The Sculptress* correctly reads "[u]nder the direction of Professor Romanelli, Florence." (Jacobson Certification Ex. 5 at 20-21)  This, he explained, "means that the work was created under the supervision of Professor Romanelli, who approved it as meeting the standards of the studio or atelier." (Jacobson Certification Ex. 5 at 21)  Yet, under Plaintiffs' expert opinion, such an inscription would require a seller to qualify the representation that the statue was "original" and to whom the piece was attributed.

"The existence of a reasonable basis in fact for information warranted" is a defense in an action to enforce such warranty in the case of "multiples produced prior to nineteen hundred." N.Y. Arts & Cult. Aff. Law § 13.05(1); *see also Dawson*, 463 F. Supp. at 467 (noting the proper standard to be applied in determining whether sellers are liable for breach of warranty is whether representations furnished by the seller "can be said to have a reasonable basis in fact, at the time that these representations were made, with the question of whether there was such a reasonable basis in fact being measured by the expert testimony provided at trial").  The experts in this case seem to agree that it is very difficult to determine whether a statue from the Nineteenth Century was truly a first version.  However, even Defendants' expert leaves open the possibility that on some occasions, one could make such a determination.  Presumably, art that falls within this exception would be more highly valued.  Drawing the reasonable inferences in Plaintiffs' favor, statues from this time period described as originals without qualification could mean that they were literally done by the hand of the artist, as opposed to being done under that artist's supervision.  *See Levin*, 459 F.3d at 77 (finding representations attributing art to a specific historical period or author an express warranty under section 13.01).

The experts also seem to disagree over what qualification, if any, is necessary when

30

warranting the name of the artist who created statues such as those purchased by Plaintiffs.  Thus, the invoices and appraisals sent by Defendants to Plaintiffs, when balanced against the experts' opinions, fail to establish a reasonable basis in fact for Defendants' unequivocal and unqualified statement that the statues were originals and their unqualified attribution of the statues to the named artists.  "Where . . . there are conflicting expert reports presented, courts are wary of granting summary judgment."  *Harris v. Provident Life & Accident Ins Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (collecting cases).  Accordingly, in light of section 13.01's guidance regarding authorship, the conflicting expert opinions of the experts, and the warranties made, Defendants' summary judgment motion for this claim is denied.

### 2.  Condition of Statues

Plaintiffs also allege that the statues were in worse condition than warranted.  Casper's appraisal was the only representation sent to Plaintiffs that commented on the condition of the statues.  His appraisal noted that the statues were all in "excellent" condition.  (Jacobson Certification Ex. S)  Friedman's evaluation of the statues mirrored Casper's appraisal and she told McClare that, in her opinion, the statues "were in pristine condition and beautiful."[12] (Jacobson Certification Ex. PP)  In contrast, Plaintiffs' expert's appraisal, conducted four years after the sale was completed, concluded that all but one of the statues, *Cleopatra*, was damaged.  (Jacobson Certification Ex. 2)  Among other reasons, Defendants' expert challenged this conclusion arguing that under prevailing practice in the trade, "dealers in 19th century sculpture do not list any damage and restoration unless it is truly significant."  (Jacobson Certification Ex.

---

[12] Friedman also noted in her Declaration that she remembered that each of the statues "was in pristine, excellent condition," and they "were not chipped, scraped, or otherwise marred at all."  (Jacobson Certification Ex. PP)

5 at 7)  Plaintiffs' expert did not contest this point.  Moreover, Plaintiffs' expert specifically

disclaimed his qualification as an expert in assessing the condition of such sculptures.  In fact,

Plaintiffs' expert explicitly stated in his "limiting conditions" that he "is not trained as a

conservator and is not qualified to assess the condition of the sculptures in this appraisal;

questions regarding their condition should be directed to a qualified expert."  (Jacobson

Certification Ex. 2 at 41)

Given Defendants' expert's uncontradicted opinion indicating that art dealers do not list

damages in such statues unless truly significant, the fact that Plaintiffs' expert's inspection of the

statues occurred four years after the Levins took possession of the statues, and Plaintiffs' expert's

explicit acknowledgment that he is unqualified to assess the condition of such statues, there is no

genuine factual dispute that Defendants had a reasonable basis in fact as measured by trade

practice, at the time the representations were made, to state the statues were in "excellent"

condition.  *See Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 670-71 (S.D.N.Y. 1995)

(holding no genuine issue of fact existed to preclude summary judgment where expert testimony

on the issue was undisputed).  Accordingly, Defendants' Motion for Summary Judgment on this

claim is granted.

### 3.  Value of Statues

Plaintiffs' breach of express warranty claim also asserts that Defendants breached their

warranties because all of the statues were overvalued in the invoice and appraisals sent by

Defendants to Plaintiffs.  Defendants argue that under N.Y. U.C.C. § 2-313(2) the value

attributed to each statue is a "non-actionable opinion of value."

Unlike attributions of authorship and dating, there is no specific provision of the New

York Arts Law delineating how to treat a representation of price or value in a certificate of authenticity or in a similar written instrument.  However, such a representation should fall under section 13.01(1)(b), which creates an express warranty for "the material facts" stated in such an instrument.  Even if the New York Arts Law does not supplant the New York U.C.C. provisions concerning representations of value, applying the relevant U.C.C. provisions does not change the analysis.

The New York Uniform Commercial Code provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  N.Y. U.C.C. § 2-313(1)(a).  Under N.Y. U.C.C. § 2-313(2), "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."  N.Y. U.C.C. § 2-313(2).  However, the Official Comments further explain that whether representations of value are enforceable depends upon the specific facts surrounding the bargain in question:

> Concerning affirmations of value or a seller's opinion or commendation under subsection (2), the basic question remains the same:  What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain? . . . [A]ll of the statements of the seller do so unless good reason is shown to the contrary.  The provisions of subsection (2) are included, however, since common experience discloses that some statements or predictions cannot fairly be viewed as entering into the bargain.

N.Y. U.C.C. § 2-313 cmt. 8.  _____

_____Defendants' invoice, which stated the prices of the statues sold to Plaintiffs, is within what section 2-313 defines as "merely the seller's opinion" of the goods and therefore did not

create a warranty as to the value of the statues.  However, after Plaintiffs expressed concerns

regarding the cost of the statues, the three appraisals sent by Defendants to Plaintiffs potentially

take on a different character.  The appraisers represented, with little qualification, the "market" or

"replacement" value of the statues.  These estimates were prices that, from their experience, were

represented as "competitive with the current market."  (Scibelli Aff. Ex. 9)  Plaintiffs' expert's

estimated fair market value of each of the statues is considerably lower than Defendants'

appraisals.[13]  Defendants provided the appraisals after being told that Plaintiffs had "cold feet

because they thought the price was too high," and understood that the appraisals would be shown

to Plaintiffs to assuage their concerns.  (Scibelli Supp. Aff. Ex. D at 75)  Under these

circumstances the Court finds that there is a genuine issue of material fact as to whether the

appraisals went beyond mere affirmation of value, opinion, or commendation, and became part of

the basis of the bargain to induce Plaintiffs to complete the purchase.  Therefore, Defendants'

Motion for Summary Judgment with respect to Plaintiffs' warranty cause of action concerning

the value of the statues is denied.[14]

### 4.  *Nude with Butterfly*

As noted earlier, Defendants concede that the invoice and appraisals sent to Plaintiffs

misrepresented the name of the artist of *Nude with Butterfly* as A. Gearls, when in fact, the

---

[13] Plaintiffs' expert considered the total fair market value of the statues as $125,000.
(Jacobson Certification Ex. 2)  In contrast, Defendants' appraisals ranged in value from
$1,110,000 to 1,325,000.  (Scibelli Aff. Exs. 7-9)

[14] The Court notes, however, that Plaintiffs' expert's valuation of the statues four years
after the purchase was completed runs directly counter to Plaintiffs' appraiser's contemporaneous
estimation of the value of the pieces.  In any assessment of damages under this claim, Friedman's
valuation of the price of the statues, at the time of sale, is necessarily material.

correct name of the artist was Charles Henry Geerts.  (Defs.' Br. 9 n.1)  Defendants nevertheless

maintain that this misattribution did not damage Plaintiffs because rather than buying an

unknown artist's work, they acquired a piece by a recognized artist.  Defendants also argue that

the name of the artists as represented in the invoice and the appraisals "was not part of the 'basis

of the bargain,' and, therefore, did not rise to the level of an express warranty . . . ."  (Pls.' Opp.

Mem. 5)  Plaintiffs have cross-moved for summary judgment on their breach of warranty claim

solely as to *Nude with Butterfly*.

Casper's appraisal sent to Plaintiffs indicated that "the statements of fact contained in

[his] report are true and correct to the best of [his] knowledge."  (Scibelli Aff. Ex. 7)  Casper also

noted that the artist is among the "elements that specifically contribute to the market value of all

works of art," and that the listed artists are "recognized as masters of carved marble, and for the

quality and intricate workings of the material."  (Scibelli Aff. Ex. 7)  It is apparent from the plain

language of this appraisal that it warrants the accuracy of the statements of fact, including the

name of the artist.  Moreover, the appraisal explains that the artist is a material fact that goes into

evaluating the price of a given piece of art.  Thus, Defendants' concession of this missatribution

means they breached their warranty of the accuracy of the appraisal.  *See Levin*, 459 F.3d at 77

(finding representations attributing art to a specific historical period or author to be an express

warranty under section 13.01); *Weber v. Peck*, No. 97 Civ. 7625, 1999 WL 493383, at *3

(S.D.N.Y. July 9, 1999) (granting summary judgment on breach of warranty claim where bill of

sale warranted painting was "authentic and as described" and defendant conceded bill of sale's

provenance description was inaccurate).  Plaintiffs' Motion for Summary Judgment as to liability

on their express warranty claim under the New York Art Law is, therefore, granted.

Plaintiffs' potential damages from this breach, if any, and whether, in fact, Plaintiffs received a statue worth more than originally warranted involve factual determinations that cannot be resolved on this motion.  *Weber*, 1999 WL 493383, at *3 (damages from breach of warranty claim not appropriately resolved on a motion for summary judgment because they are "dependent upon the extent to which the [art piece's] loss in value was caused by th[e] breach which involves factual issues that cannot be resolved on this motion").  Accordingly, damages on this claim are to be determined at trial.

### D.  Timely Rescission and Revocation

Even if Defendants breached their express warranties, Defendants argue that Plaintiffs' revocation of the statues in April 2004 was not within a reasonable time after delivery was completed, and therefore their warranty claims are barred as a matter of law.

Under N.Y. U.C.C. article 2, Plaintiffs had three options upon delivery of the allegedly nonconforming statues.  Plaintiffs had the option to reject the statues, *see* N.Y. U.C.C. § 2-602, revoke their acceptance upon discovery of the nonconformity, *see* N.Y. U.C.C. § 2-608, or accept the statues and seek damages for the loss resulting from Defendants' alleged breach, *see* N.Y. U.C.C. § 2-714.  *See generally Cliffstar Corp. v. Elmar Indus., Inc.*, 678 N.Y.S.2d 222, 222-23 (App. Div. 1998).

In order to revoke or reject goods, a buyer must make a timely "clear and unequivocal act of rejection."  *Hooper Handling, Inc. v. Jonmark Corp.*, 701 N.Y.S.2d 577, 578 (App Div. 1999) (citing *Sears, Roebuck & Co. v. Galloway*, 600 N.Y.S.2d 773, 775 (App. Div. 1993)); *see also Cliffstar*, 678 N.Y.S.2d at 223 (noting U.C.C. § 2-608's requirement for buyer to provide "unequivocal timely notice" of revocation of acceptance).  The undisputed facts here establish

that Plaintiffs accepted the statues no later than the date they were delivered in mid-August 2000.

"'Goods that a buyer has in its possession necessarily are accepted or rejected by the time a reasonable opportunity for inspecting them passes.'"  *Weil v. Murray*, 161 F. Supp. 2d 250, 256 (S.D.N.Y. 2001) (quoting *Seabury Constr. v. Jeffrey Chain Corp.*, No. 98 Civ. 5941, 2000 WL 1170109, at *2 (S.D.N.Y. Aug. 17, 2000)).

        As described above, Plaintiffs' independent appraiser, Friedman, inspected the statues in early February 2000.  Plaintiffs also had an opportunity to further examine the statues during the time they were held by Defendants at Plaintiffs' request, until Plaintiffs completed construction on their Boston home.  Thus, from February 22, 2000, when Defendants were paid, until mid-August 2000, when the statues were delivered to Plaintiffs, there is no evidence to suggest that Plaintiffs could not inspect the statues further if they so desired.  There is also no evidence to suggest that Plaintiffs found the statues unsatisfactory or non-conforming before the email sent by Ms. Levin to Harned on December 6, 2000.  It is also undisputed that sometime in 2003, another appraiser, Falwell, was hired by Plaintiffs after he informed them that one of the statues previously had sold at a relatively low price.  Falwell's inspection of the statues, done with a black light, allegedly revealed that the statues were damaged.  Nevertheless, it was not until April 14, 2004, approximately four years after purchasing the statues, that Plaintiffs notified Defendants, for the first time, of their unequivocal intention to revoke.  Although the timeliness of a buyer's rejection or revocation of acceptance of non-conforming goods is generally a question reserved for the trier of fact, *see Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051 (2d Cir. 1983), no reasonable jury could find that Plaintiffs did not accept the five statues in light of the undisputed facts that their independent experts inspected the

statues in both February 2000 and sometime in 2003, and they nonetheless continued to retain possession of the statues. *See Weil*, 161 F. Supp. 2d at 256 (finding ineffective rejection when buyer had reasonable time to inspect painting, actually inspected painting, and continued to retain possession of the painting); *Weber*, 1999 WL 493383, at *3-4 (holding buyer of painting not entitled to rescission as a remedy due to failure to timely notify defendant of the revocation of his acceptance where buyer was aware of problems with representations made).

Although the Court finds Plaintiffs' notice of revocation untimely, Plaintiffs could still seek damages for the alleged breach of the warranties if Defendants were timely notified of that breach. *See Cliffstar*, 678 N.Y.S.2d at 223; *see also Weber*, 1999 WL 493383, at *4 (citing *Sears, Roebuck & Co.*, 600 N.Y.S.2d at 775). A buyer's right to sue for damages is preserved as long as he notifies the seller "within a reasonable time after he discovers or should have discovered any breach." N.Y. U.C.C. § 2-607(3)(a); *see also Cliffstar*, 678 N.Y.S. 2d at 223. A "reasonable time" for notification from a retail consumer "is to be judged by different," more lenient, standards than those applied to merchant or commercial buyers. N.Y. U.C.C. § 2-607 cmt. 4; *accord Great Am. Ins. Co. v. M/V Handy Laker*, No. 96 Civ. 8737, 97 Civ. 7400, 2002 WL 32191640, at *10 (S.D.N.Y. Dec. 20, 2002) ("What constitutes a reasonable time is a factual determination and depends on the nature, purpose, and circumstances of the particular case."). This is intended to fulfill the goal of notification in defeating commercial bad fath, rather than depriving a good faith consumer of his remedy. *See* N.Y. U.C.C. § 2-607 cmt. 4. Under New York law, what constitutes a "reasonable time" is "generally held to present questions of fact for the jury." *Sherkate*, 701 F.2d at 1051 (collecting cases); *see also Texpor Traders, Inc. v. Trust Co. Bank*, 720 F. Supp. 1100, 1110 n.8 (S.D.N.Y. 1989). In this case, Defendants have fewer of

the typical reasons to complain of untimely notification.  First, there is no evidence to suggest

that the statues are "perishable goods nor goods which fluctuated rapidly in price."[15]  *Sherkate*,

701 F.2d at 1052.  "Moreover, the variance from the terms of the sales contract might well have

gone unnoticed for some time by an inexpert observer," such as the Plaintiffs.  *Id.*  As a matter of

law, the Court is not prepared to hold that Plaintiffs should have discovered that the statues

allegedly varied from the contract specifications before they notified Defendants.  This is a

question better resolved by a jury, especially in light of the fact that there has been no showing of

substantial prejudice to Defendants from the delayed rejection.  *Id.*

      E.  Money Had and Received, Promissory Estoppel, Unjust Enrichment and Negligence

      Plaintiffs' fourth through eighth causes of action are for money had and received, unjust

enrichment, promissory estoppel, and negligence.

      "The existence of a valid and enforceable contract governing a particular subject matter

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."

*Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 516 N.E.2d 190, 193 (N.Y. 1987).  Here, there is no

dispute over the validity or enforceability of the underlying contract.  The causes of action for

money had and received, promissory estoppel, unjust enrichment, and negligence are all quasi-

---

[15] Defendants, for the first time at oral argument, maintained they are prejudiced by Plaintiffs' delayed rejections.  Defendants argued that the art market is "volatile," and suggested that Plaintiffs purchased the statues during a high period in the market.  (Tr. 16-17, Aug. 28, 2006)  Therefore, Defendants argue, Plaintiffs' delay allows a buyer to wait until a market drop and then unfairly seek revocation of the now lower-priced goods.  This argument fails for two reasons.  First, Defendants did not submit any evidence to support their contention that Plaintiffs purchased the statues when the market for such works was high.  Second, because the true value of the statues is so hotly contested, Plaintiffs would argue that a lower valuation for the statues would actually reflect the true value of the works as of the date purchased rather than be a reflection of any general market depreciation.  This type of assessment is more appropriately left for expert testimony and the finder of fact.

contract claims and are therefore not viable, where, as here, it is undisputed that the parties

entered into an express agreement that governs the dispute.  *See Four Finger Art Factory, Inc.*,

2000 WL 145466, at *8 (promissory estoppel);[16] *Middle East Bank, New York Branch v.*

*Harmony Sportswear, Inc.*, No. 93 Civ. 228, 1994 WL 74057, at * 6 (S.D.N.Y. Mar. 10, 1994)

(negligence); *Lum v. New Century Mortgage Corp.*, 800 N.Y.S.2d 408, 410 (App. Div. 2005)

(money had and received and unjust enrichment).[17]  Accordingly, Plaintiffs' quasi-contract

claims for money had and received, promissory estoppel, unjust enrichment, and negligence are

dismissed.

   F.  Deceptive Trade

     Plaintiffs' ninth and final cause of action alleges a violation of section 349 of the New

York General Business Law, which prohibits "[d]eceptive acts or practices in the conduct of any

business."  N.Y. Gen. Bus. Law § 349(a).

     To prevail on a section 349 claim, a plaintiff must show that:  "(1) the defendant's

deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3)

the plaintiff has been injured as a result."  *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir.

2000) (per curiam).  Defendants contend that Plaintiffs' claim under section 349 fails because the

---

     [16] As noted *supra*, Plaintiffs' promissory estoppel claim is also dismissed on account of there being no justifiable reliance.

     [17] One of the recognized exceptions to this general principle is where a plaintiff can demonstrate a viable fraud claim based on misrepresentations that were made before the formation of the contract that induced the plaintiff to enter the contract.  *See Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003) (citing *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)); *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767-68 (N.Y. 1995).  However, "where a party is merely seeking to enforce its bargain, a tort claim will not lie."  *New York Univ.*, 662 N.E.2d at 768.  Thus, where the fraud claim is insufficient as a matter of law, as here, this exception does not resuscitate Plaintiffs' quasi-contract claims.

transaction did not affect the public interest.  Rather, they argue, Plaintiffs' claim only concerns an isolated business transaction that "does not have any ramifications on the consuming public." (Defs.' Br. 18)  Plaintiffs allege that Defendants' deceptive actions include advertising their goods for sale to the public and holding themselves out as having expertise in art and antiques, which has the potential to injure consumers similarly situated to Plaintiffs.  (Compl. ¶ 65)

Section 349 was meant to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 744 (N.Y. 1995) (quotations omitted).  Under the statute, private, unique "single-shot" contractual transactions are not cognizable and plaintiffs "must demonstrate that the acts or practices have a broader impact on consumers at large."  *Id.*; *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("It is clear that the gravamen of the complaint must be consumer injury or harm to the public interest." (quotations omitted)).  Although not particularly complex, this transaction is unlike the "'modest' type of transaction the statute was primarily intended to reach."  *New York Univ.*, 662 N.E.2d at 771.  It is essentially a "private" contract dispute involving art priced at close to one million dollars, where each side commissioned and received their own expert appraisals before completing the transaction, and it is devoid of any evidence that Defendants' alleged conduct had a broader impact on consumers at large.  *Id.*  Accordingly, the cause of action under section 349 is dismissed.[18]

---

[18] Defendants also argue the section 349 claim should be dismissed on account of statute of limitations grounds.  Because the Court otherwise dismisses the claim, it does not address the limitations argument.

### III. Conclusion

For the forgoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion for Summary Judgment as to Plaintiffs' claims for misrepresentation/fraud, money had and received, unjust enrichment, promissory estoppel, negligence, and deceptive trade is granted in full.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim for breach of express warranties is granted in part and denied in part. Summary judgment as to the claims related to the representations that the statues were original and signed and as to the value of the statues is denied. Summary Judgment as to the condition of the statues is granted. Plaintiffs' warranty claims are limited to damages under a breach of contract action.

Plaintiffs' Cross-Motion for Summary Judgment on their breach of warranty claims related to *Nude with Butterfly* is granted in part and denied in part. Plaintiffs' Cross-Motion for Summary Judgment as to liability on this claim is granted, with damages on this claim to be determined at trial. Plaintiffs' Cross-Motion for Summary Judgment on their remaining causes of action related to *Nude with Butterfly* is denied.

SO ORDERED.

Dated:        September **28**, 2006
             New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE